UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELICIA SAUL, an individual on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINEAGE LOGISTICS SERVICES LLC; PERISHABLE SHIPPING SOLUTIONS LLC, and DOES 1 through 25, Inclusive,<br><br>Defendants. | No. 2:24-cv-01331-DJC-CSK<br><br>**ORDER** |

Pending before the Court is Defendants' Motion to Compel Arbitration. (ECF No. 11, hereinafter "Mot."; *see* First Amended Complaint (ECF No. 4, hereinafter "FAC").) The Court held a hearing on October 17, 2024, and took the matter under submission. For the reasons set forth below, the Court will GRANT in part and DENY in part Defendant's Motion to Compel Arbitration. The Court will stay the surviving claims pending the resolution of the arbitrated claims.

## BACKGROUND

Plaintiff Felicia Saul was employed full-time by Defendants Lineage Logistics Services LLC ("Lineage") and Perishable Shipping Solutions LLC ("Perishable") from

December 2021 through September 2022, and again from May 2023 through September 2023.  (FAC ¶ 3; ECF No. 11, Declaration of Joana Murphy, hereinafter "Murphy Decl." ¶ 7.)  Lineage acquired Perishable in 2021, and Perishable is now a subsidiary of Lineage.  (ECF No. 17, Declaration of Brian Golper, hereinafter "Golper Decl." ¶ 3.)  Defendant provides frozen food storage, packaging of client frozen goods for delivery, and food transportation.  (Murphy Decl. ¶ 2.)  Defendant operates distribution center warehouses throughout the country, including one in Sacramento, California.  (*Id.*; FAC ¶¶ 2, 21, 24).

Plaintiff was employed at the Sacramento facility, and her work duties included assembling boxes used to store and ship products from the warehouse, inserting insulating linings, affixing shipping labels, and sorting boxes for storage or shipment.[1] (FAC ¶ 4; Mot. at 2.)  Plaintiff alleges that Defendant failed to pay regular wages by requiring off-the-clock work, provide legally mandated meal and rest breaks, reimburse expenses, provide accurate wage statements, and to pay wages due upon workers' termination.  (FAC ¶¶ 67–109.)  Plaintiff further alleges that these charges are in violation of California quota laws and the Unfair Competition Law.  (*Id.* ¶¶ 110–128.)  Plaintiff brings this action for herself and on behalf of a proposed class of similarly situated parties.

Plaintiff and Defendant allegedly entered into an Employee Agreement to Arbitrate and later a Mutual Arbitration Agreement (the "Arbitration Agreements" or "Agreements"), under which Plaintiff agreed to arbitrate all claims arising under the

---

[1] Defendant maintains that these were Plaintiff's sole work duties and that she did not physically move any boxes once goods had been placed within them. (Mot. at 8.)  Plaintiff asserts that her work duties also included loading and wrapping pallets (FAC ¶ 4), transporting packages internally within the warehouse (ECF No. 16, Declaration of Felicia Saul at ¶¶ 5, 7, 8), and packing boxes with products (*Id.* ¶ 9). Defendant challenges both the admission and the veracity of Plaintiff's statements. (*See* ECF No. 17, Objections to Plaintiff's Evidence.)  At this juncture, the Court need not reach the question of which description of Plaintiff's work duties is accurate because, as discussed below, Plaintiff succeeds in her Federal Arbitration Act exemption argument even if the more limited work responsibilities alleged by Defendant are true.  However, at oral argument for this Motion's hearing, Defendant agreed that the Court may view the disputed facts in the light most favorable to Plaintiff.

2

Labor Code and waived any right to bring a class action claim. Defendant moves to compel arbitration under the Federal Arbitration Act ("FAA") and California state arbitration laws. (*See generally*, Mot.) Plaintiff asserts that she was an employee engaged in interstate commerce and is thus exempt from binding arbitration agreements under the FAA. Plaintiff also claims that her claims are exempt from California arbitration laws.

Plaintiff filed her First Amended Complaint (ECF. No. 4) on June 11, 2024, and Defendant filed a Motion to Compel Arbitration (ECF No. 11) on August 16, 2024. Plaintiff then filed an Opposition (ECF No. 16) on August 30, 2024. Defendant filed a Reply (ECF No. 17) on September 9, 2024, and Plaintiff filed an Objection (ECF No. 18) on September 16, 2024. Plaintiff filed a sur-reply (ECF. No. 22) on October 16, 2024. The issue has been fully briefed.

### I.   Legal Standard

The FAA governs arbitration agreements. 9 U.S.C. § 2. Under the FAA, a signatory to an arbitration agreement may obtain an order directing a noncomplying party to arbitrate in the manner provided for in the agreement. 9 U.S.C. § 4. In weighing a motion to compel arbitration, a court must determine: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir. 2016) ("*Boardman*"). "Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011) ("*Concepcion*"). But, the FAA's mandate of arbitration contract enforcement can be "overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) ("*Shearson*").

"When considering a motion to compel arbitration, a court applies a standard similar to the summary judgment standard" of Federal Rule of Civil Procedure 56. *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004) (citations omitted) ("*Concat*"); *see also Cox v. Ocean View Hotel* Corp., 533 F.3d 1114, 1119 (9th

Cir. 2008) ("[D]enial of a motion to compel arbitration has the same effect as a grant of partial summary judgment denying arbitration . . . ."); *Greystone Nevada, LLC v. Anthem Highlands Cmty. Ass'n*, 549 F. App'x 621, 623 (9th Cir. 2013) (reversing an order compelling arbitration where opposing party had been afforded no opportunity to present evidence and argument).  The party opposing arbitration receives the benefit of any reasonable doubts and the court draws reasonable inferences in that party's favor, and only when no genuine disputes of material fact surround the arbitration agreement's existence and applicability may the court compel arbitration. *Concat*, 350 F. Supp. 2d at 804; *see Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991).  Nevertheless, the decision to compel arbitration is mandatory, not discretionary, if the requirements are met.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("*Dean*").  The FAA preempts state laws that conflict with the purpose of the FAA by applying stricter requirements to arbitration agreements than contracts generally.  *See Concepcion*, 563 U.S. at 343.

## II. Discussion

For the reasons set forth below, the Court finds that the evidence submitted by Defendant sufficiently proves the existence of two separate arbitration agreements, both signed by Plaintiff, that encompass the disputed issues.  However, the Court finds that Plaintiff, due to her specific work duties, is covered by the FAA's transportation worker exemption, and thus, the FAA cannot be used to mandate compliance with the agreements.  The Court further finds that two causes of action are not covered by the arbitration agreements under California law.  Accordingly, the Court will not compel Plaintiff to arbitrate those specific claims against Defendant. Further, the Court finds that the class action waiver is valid, and thus, the remaining claims must proceed on an individual basis, pending the resolution of the arbitrated claims.

////

////

### 1. Existence of valid arbitration agreements that encompass the disputed issues

As an initial step, the Court must determine: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Boardman*, 822 F.3d at 1017. The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate. *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). In resolving a motion to compel arbitration, "[t]he summary judgment standard [of Federal Rule of Civil Procedure 56] is appropriate because the district court's order compelling arbitration 'is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.'" *Hansen v. LMB Mortg. Servs., Inc.*, 1 F. 4th 667, 670 (9th Cir. 2021) (internal quotations omitted). "When deciding whether the parties agreed to arbitrate a certain matter . . ., courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Alexander v. Codemasters Grp. Ltd.*, 104 Cal. App. 4th 129, 141 (2002), disapproved of on other grounds by *Reid v. Google, Inc.*, 50 Cal. 4th 512, 524 (2010).

Defendant alleges that Plaintiff electronically signed two separate arbitration agreements, an "Employee Agreement to Arbitrate," which was signed on March 14, 2022, and a "Mutual Arbitration Agreement," which was signed on May 19, 2023. (Mot. at 1.) As proof of this, Defendant offers a declaration of Joanna Murphy, who is the Director of Human Resources Service for Lineage and has "personal knowledge about how onboarding has generally been conducted [at Lineage] from 2012 to the present." (Murphy Decl. ¶ 4.) In her declaration, Murphy states that "[a]t the time of hire, employees are provided with copies of Lineage's various policies." (*Id*. ¶ 5.)

1  According to Murphy, new employees "can take as much time as desired to review
2  any of the documents before" signing them and that they may ask human resources
3  personnel any questions related to those documents. (*Id.* ¶ 6.)
4       Murphy claims that she has "personally reviewed documents concerning
5  Plaintiff that are maintained in the normal course of business" and that based on that
6  review, Murphy asserts that Plaintiff "was provided with an onboarding package" and
7  that "Plaintiff signed the Employee Agreement to Arbitrate" and the Mutual Arbitration
8  Agreement. (*Id.* ¶¶ 7-10.) Attached to Murphy's declaration is a copy of the
9  Employee Agreement to Arbitrate and a copy of the Mutual Arbitration Agreement.
10 (*Id.* ¶¶ 9, 12, Ex. A and C.) The declaration also includes an electronic signature from
11 Plaintiff Saul acknowledging her agreement to the Employee Agreement to Arbitrate,
12 and an electronic signature from Plaintiff Saul acknowledging her agreement to the
13 Mutual Arbitration Agreement. (*Id.* ¶¶ 20, Ex. D and E.)
14      Here, no reasonable inference can be drawn in Plaintiff's favor that the
15 arbitration agreements were not formed. She provides no evidence that the
16 Agreements do not exist, nor does she contest that she signed them. Further, Plaintiff
17 does *not* contest the validity of the Employee Agreement to Arbitrate, the first
18 agreement signed by the parties. Her primary claim against the validity of the
19 Arbitration Agreements is that the second agreement, the Mutual Arbitration
20 Agreement, is not binding because it was allegedly signed *only* by Plaintiff, rather than
21 by Plaintiff *and* Defendant (Opp'n. at 8-9). The lack of dual signatures on the Mutual
22 Arbitration Agreement is not dispositive when it is otherwise clear the parties
23 intended to be bound by the agreement. *See Borelli v. Black Diamond Aggregates,*
24 *Inc.*, 2017 WL 1063564, *6 (E.D. Cal. 2017) ("Although an arbitration agreement must
25 generally be memorialized in writing, the writing memorializing an arbitration
26 agreement need not be signed by both parties in order to be upheld as binding.")
27 (citations omitted); *see also Serafin v. Balco Properties Ltd., LLC*, 235 Cal. App. 4th
28 165, 176 (2015) ("[T]he writing memorializing an arbitration agreement need not be

6

signed by both parties in order to be upheld as a binding arbitration agreement.")[2]  As to the other Employee Agreement to Arbitrate, Plaintiff alleges, without citation to case law, that Agreement was executed with Lineage, and not Perishable, it is not valid. (Opp'n at 9.)  However, at the time of Saul's hiring by Lineage, Lineage had already been acquired by Perishable and was its subsidiary. (*See* Golper Decl. ¶ 3.)

Regardless, there is ample evidence here that both parties did not need to sign the Mutual Arbitration Agreement for them to intend it to be binding.  For example, the text of the agreement does not require that a signature from either party be necessary for the agreement to take effect.  The agreement states: "<u>Your decision to accept employment or to continue employment with the Company constitutes your agreement to be bound by the [Mutual Arbitration Agreement]</u>.  Likewise, the Company agrees to be bound by the [Mutual Arbitration Agreement]." (Murphy Decl. Ex. B.)  The agreement never contemplated a signature for it to be valid–the mere act of accepting employment on the part of the Plaintiff, and of continuing Plaintiff's employment on the part of the Defendant, was sufficient to establish intent of a valid agreement requiring arbitration under the agreement's text.  In any event, the Plaintiff does not meaningfully dispute the validity of the Employee Agreement to Arbitrate, which *was* signed by both Plaintiff and Defendant.

Plaintiff does not challenge that the Agreements, if they are valid, encompass the types of claims brought here.  Nor can she.  The text of the Agreements explicitly mentions the claims brought in this case–employment claims related to wages, overtime, breaks, reimbursement, and violations of state law. (See Murphy Decl. Ex. A

---

[2] Plaintiff relies on an unpublished California Court of Appeal case, *Ortiz v. Nellson Nutraceutical, LLC*, 2023 Cal. App. Unpub. WL 5425282 (August 23, 2023) to bolster her claim that the Mutual Arbitration Agreement is not valid because Defendant did not sign the agreement.  As an unpublished case, this decision is not precedential.  *See People v. Superior Ct. (Clark)*, 22 Cal. App. 4th 1541, 1548 (1994) (an unpublished opinion cannot be relied on by a party); Cal. R. Ct. 8.1115.  This unpublished case does not supersede the existing, published, caselaw supporting the conclusion that a valid arbitration agreement may exist when there is evidence that the parties *intended* to be bound by an agreement. *See Borelli*, 2017 WL 1063564 (E.D. Cal. 2017); *see also Serafin*, 235 Cal. App. 4th 165 (2015).

("I agree that the [Employee Agreement to Arbitrate] covers any claim, dispute, and/or controversy that either I . . . may have against the Company . . . or that the Company may have against me, arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, or other association with the Company."); *Id.* Ex. C ("Claims subject to [the Mutual Arbitration Agreement] include all claims involving your employment with the Company, including during the application and background check process, during employment, at separation(i.e., after the employment relationship ends) [*sic*]. This includes without limitation any and all claims for discrimination, harassment, or retaliation; wages, overtime, breaks, reimbursement, or any other compensation; breach of any express or implied contract; negligence or other tort; or violation of any federal, state, or local law.").) The only conclusion that can be drawn from the text of the Agreements is that the parties intended the Agreements to cover the types of claims raised in the present action.

The Court concludes that Defendants have met their burden of showing by a preponderance of evidence that two valid arbitration agreements exist (the Employee Agreement to Arbitrate and Mutual Arbitration Agreement), that the parties agreed to the arbitration agreements, and that these agreements encompass the disputed issues.

### 2. The Federal Arbitration Act generally requires courts to enforce arbitration agreements

The FAA establishes a strong federal policy favoring arbitration, requiring courts to "rigorously enforce agreements to arbitrate." *Shearson*, 482 U.S. at 226, quoting *Dean*, 470 U.S. at 221. Under the FAA, arbitration agreements shall generally be "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Court shall "enforce covered arbitration agreements according to their terms," and any "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration." *Lamps Plus v. Varela,* 587 U.S. 176, 178, 189 (2019).

The terms of both arbitration agreements signed by Plaintiff explicitly specify the signatories' intent that those agreements be governed by the FAA. (*See* Murphy Decl. Ex. A ("I also understand that the arbitration will be governed by the Federal Arbitration Act"); *see also* Murphy Decl. Ex. C. ("This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq").) Given the agreements' express identification of the FAA as the governing statute and the general principle that the FAA governs arbitration agreements, the Court concludes that there is a presumption that the arbitration agreements are enforceable under the FAA absent an explicit statutory exception indicating otherwise.

### 3. Exemption to the Federal Arbitration Act for workers engaged in interstate commerce

Although there is a strong presumption in favor of enforcing arbitration agreements, "the Arbitration Act's mandate may be overridden by a contrary congressional command." *Shearson*, 482 U.S. at 226. One such contrary congressional command is section 1 of the FAA, under which a court shall exempt "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" from the binding nature of arbitration agreements. *See* 9 U.S.C. § 1. There are two key cases that provide context of the definition of an employee engaged in interstate commerce within the meaning of the FAA.

First is *Sw. Airlines Co. v. Saxon*, 596 U.S. 450 (2022) ("*Saxon*"), which laid out a two-step process for analyzing exemption claims under 9 U.S.C. § 1, which it referred to as a "transportation worker exemption." There, the Supreme Court instructed courts to: (1) determine the relevant class of workers to which the plaintiff belongs, and (2) determine whether that class is engaged in foreign or interstate commerce. *Saxon*, 596 U.S. at 455. *Saxon* involved an employee of Southwest Airlines whose work responsibilities required her to load and unload baggage, airmail, and commercial cargo on and off airplane that traveled across the country. *Id.* at 453–54.

The plaintiff sued Southwest for failure to pay overtime wages and sought to resist arbitrating her claim with Southwest by claiming the transportation worker exemption. *Id.* at 454.

The Supreme Court began by confronting the threshold question of how to define a "class of workers." *Id.* at 455. To answer this question, it focused on the specific work duties of the plaintiff, rather than the general industry she worked in or the title of her position. *Id.* at 456–57. The high court reasoned that even though the plaintiff was employed within the airline industry, which undoubtedly would include transportation workers, she still needed to show that her specific duties qualified her as a transportation worker. *Id.* at 456. Looking solely at the plaintiff's work duties, the Supreme Court determined that she belonged to a class of worker who "physically load and unload cargo on and off planes." *Id.*

Next, the Supreme Court weighed whether that class was engaged in foreign or interstate commerce under 9 U.S.C. § 1. *Id*. The Supreme Court reasoned that because the plaintiff handled cargo that was travelling in interstate commerce, she herself was, as "a practical matter, part of the interstate transportation of goods." *Id.* at 457–58. In other words, a worker that "play[s] a direct 'and necessary role in the free flow of goods across borders," or is" actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce" can be a "transportation worker" under 9 U.S.C. § 1. *Id.* at 458, quoting *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). Because the plaintiff's loading and unloading of the cargo planes was sufficiently linked to the transportation of goods in interstate commerce, the plaintiff qualified under the transportation worker exemption.

The second case is *Ortiz v. Randstad Inhouse Servs., LLC,* 95 F.4th 1152 (9th Cir. 2024), in which the Ninth Circuit held that warehouse workers who received and processed goods from international locations that were then shipped to destinations in various U.S. states were similarly covered under the transportation worker exemption in 9 U.S.C. § 1. The plaintiff in *Ortiz* was tasked with moving boxes inside

of and preparing packages to be shipped out of a specific warehouse. *Id*. at 1158. When the plaintiff sued the warehouse operator, the operator moved to compel arbitration, citing an arbitration agreement signed by the parties. *Id*. The Ninth Circuit first addressed the issue as to which class the plaintiff belonged, defining that class as one consisting of workers handling goods as they progressed through the supply chain. *Id*. at 1161. Noting that the plaintiff was responsible for the movement of packages within the facility that were tied to interstate commerce, the Ninth Circuit then reasoned that the plaintiff's work was sufficiently tied to those items' travel, and thus, the plaintiff was a transportation worker. *Id*. at 1161–62. Even though the plaintiff's work was localized to a single facility, the products that moved through the warehouse were destined for myriad locations, including out of state destinations, and thus the local nature of the employee's work was not controlling. *Id*. at 1162 ("If *Saxon* stands for anything, it is that an employee is not categorically excluded from the transportation worker exemption simply because he performs his duties on a purely local basis.") Because the plaintiff was a worker who was sufficiently implicated in the chain of interstate commerce, he was exempt from federal enforcement of the arbitration clause under 9 U.S.C. § 1.

For 9 U.S.C. § 1's exemption to apply, the Plaintiff in the present matter must show that he is sufficiently linked to the movement of goods in interstate commerce as the plaintiffs in *Saxon* and *Ortiz*.

### 4. Plaintiff's supply chain job plays a tangible and meaningful role in the movement of goods through interstate commerce

Because Plaintiff seeks relief under the transportation worker exemption in 9 U.S.C. § 1, the Court must first identify the class of workers to which Plaintiff belongs. Although Defendant provides "food transportation in multiple states throughout the United States," (Murphy Decl. ¶ 2) it is the specific nature of Plaintiff's work, rather than the employers', that is the basis for any qualification as a transportation worker. At a minimum, Plaintiff and Defendant agree that Plaintiff's work duties included

11

organizing boxes so that they could be sent to storage or picked up by a third-party delivery company.³ Under this framing, Plaintiff's class would be that of a worker who is tasked with organizing boxes as they are prepared for storage within the warehouse facility or for shipment outside the warehouse to various locations.

This meets the requirements of *Ortiz*: whether "an employee's relationship to the movement of goods [is] sufficiently close enough to conclude that his work plays a tangible and meaningful role in their progress through the channels of interstate commerce." *Ortiz*, 95 F. 4th at 1160. Here, Plaintiff's responsibilities are meaningfully tied to the movement of goods into interstate commerce. The role of preparing boxes for egress from the facility or organizing them for storage before they are ready to be shipped is necessary to the subsequent transit of those goods out of the facility. In other words, those goods cannot be transported without the workers like Plaintiff who organize them for shipment.

Turning to the question of how those goods enter the channels of interstate commerce, the Court finds that Defendant's Sacramento warehouse is sufficiently tied to the travel of goods through channels of interstate commerce. Plaintiff asserts that when she packaged boxes in the Sacramento facility, she witnessed a large number of the packages were marked for travel to destinations outside of California. (ECF No. 16, Declaration of Felicia Saul ¶¶ 9, 11.) In response, Defendant argues that the shipment of goods from the Sacramento facility were primarily destined for locations in California, but does not contest that the facility still regularly sent goods to out-of-state destinations. (*See* ECF No. 11, Declaration of Luis Vargas ¶ 10.) But again, the parties' disagreement does not matter—even if a majority of the goods shipped from Defendant's Sacramento facility were to be destined for intrastate rather than interstate commerce as Defendant claims, the facility is routinely sending shipments to

---

³ As noted in footnote 1, there is a factual dispute as to Plaintiff's work duties. (Compare FAC ¶ 4 with ECF No. 11, Declaration of Luis Vargas ¶ 5-8.) The Court need not resolve this dispute, as even the narrower scope of duties is sufficient to bring Plaintiff within the ambit of 9 U.S.C. § 1.

out-of-state locations and is thus tied to the flow of goods out of California under either party's framing.  (*See id.*)

Thus, the Court finds that Plaintiff is a member of a class that is linked to the travel of goods through interstate commerce and thus, that she qualifies under the transportation worker exemption.

### 5. In the absence of the Federal Arbitration Act, the California Arbitration Act governs

The text of the Arbitration Agreements agreed to by the parties in this litigation expressly provides that California state law controls if the FAA is found not to apply.  (Murphy Decl. Ex. B ("If for any reason the FAA is deemed inapplicable, only then will the [Employee Agreement to Arbitrate] be governed by the applicable State arbitration statutes."); *id.* Ex. C ("[I]f the FAA is found not to apply [to the Mutual Arbitration Agreement], then the arbitration law of the state in which Employee is employed or was last employed by the Company will apply.").)  Finding that the FAA does not apply, the Court next turns to whether California state laws require Plaintiff to arbitrate her claims.  The Court finds that California law permits two of Plaintiff's causes of action to proceed.

California has a "strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution."  *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak St.*, 35 Cal. 3d 312, 322 (1983).  Like the FAA, the Court must enforce the arbitration clause under state law unless a specific exemption applies.  Plaintiff raises two such exemptions here.  First, Plaintiff points to California Labor Code section 229, under which "[a]ctions to enforce the provisions of this article [sections 200 to 244] for the collection of due and unpaid wages claimed by an individual may be maintained without regard to the existence of any private agreement to arbitrate."  Second, Plaintiff relies on *Gentry v. Superior Court*, 42 Cal. 4th 443 (2007), abrogated on other grounds by *Concepcion*, 563 U.S. 333, for the proposition that the class action waiver in her arbitration agreement is unenforceable.

Plaintiff raises a number of claims related to her employment with Defendants that potentially come within the ambit of Labor Code section 229. Those claims are for the alleged violation of: (1) Labor Code sections 200, 204, and 1194 (failure to pay wages for off-the-clock work), (2) Labor Code sections 226.7 and 512 (failure to provide meal breaks or compensation in lieu thereof), (3) Labor Code sections 226.7 (failure to authorize and permit rest breaks or compensation in lieu thereof), (4) Labor Code section 2802 (failure to reimburse expenses), (5) Labor Code section 226 (failure to provide accurate wage statements), (6) Labor Code sections 201, 202, and 203 (failure to pay all wages due upon termination), (7) Labor Code section 2100 et seq. (failure to comply with California Quota Laws), and (8) Business and Professions Code section 17200 et seq. (violation of the Unfair Competition Law).

Plaintiff's first and sixth causes of actions pertain to the alleged nonpayment of wages by Defendants brought under Article I of the Labor Code and are therefore exempted from mandatory arbitration under Labor Code section 229. However, Plaintiff's second, third, fourth, fifth, seventh, and eighth claims are not related to unpaid wages and do not raise claims under sections 200 through 244 of the Labor Code and thus are not subject to section 229's application. *Lane v. Francis Capital Mgmt. LLC*, 224 Cal. App. 4th 676, 684 (holding that section 229 applies only to sections 200 through 244 because "[s]ection 229 is found in article 1 of division 2, part I, chapter 1 of the Labor Code, encompassing sections 200 through 244").

Plaintiff argues that under the Supreme Court's decision in *Naranjo v. Spectrum Sec. Services, Inc.*, 13 Cal. 5th 93 (2022), the remaining claims are in fact claims for unpaid wages and therefore covered by Labor Code section 229. In *Naranjo*, plaintiffs had sued for a violation of state meal break requirements under an Industrial Welfare Commission wage order. *Id*. at 102. Pursuant to Labor Code section 226.7, plaintiffs sought an additional hour of pay for each day on which the defendant failed to provide the legally required break. *Id*. at 102–03. On review, the issue was whether the failure to give the "premium pay" required by section 226.7(c) also constituted a

14

failure to pay the wages of an employee who is discharged or quits under Labor Code section 203. *Id*. at 105. While the California Supreme Court recognized that the premium pay is in part a penalty, it concluded that pay owed under section 226.7 "can equally be viewed as wages." *Id*. at 107. Accordingly, the Court concluded that "missed-break premium pay constitutes wages for purposes of Labor Code section 203, and so waiting time penalties are available under that statue if the premium pay is not timely paid." *Id*. at 117.

In reaching its conclusion, the California Supreme Court distinguished a prior case, *Kirby v. Immoos Fire Prot., Inc*., 53 Cal. 4th 1244 (2012). In *Kirby*, the California Supreme Court concluded that an action brought under Labor Code section 226.7 was not an "action brought for the nonpayment of wages" for purposes of the attorney fee provision in Labor Code section 218.5(a). *Id*. at 1255. Rather, the court concluded, "a section 226.7 action is brought for the nonprovision of meal and rest periods, not for the 'nonpayment of wages.'" *Id*. (emphasis omitted). While some lower state courts had read *Kirby* to suggest that "the legal violation underlying a section 226.7 claims is . . . not the nonpayment of wages," *Naranjo*, 13 Cal. 5th at 111 (internal citations omitted), the California Supreme Court rejected that conclusion and highlighted the different inquiry that was the subject of *Kirby*:

> *Kirby* explained that our prior conclusion that premium pay is a wage did not necessarily mean that an action under section 226.7 is an action for nonpayment of wages under section 218.5. The characterization of the nature of an action under section 218.5 turns instead on the nature of the underlying legal violation the action seeks to remedy, not the form of relief that might be available to cure that violation.

*Naranjo*, 13 Cal. 5th at 111. That is to say, while *Kirby* was concerned with the "action" as that term was understood in section 218.5, *Naranjo* was concerned with what constituted "wages" for purposes of section 203.

The inquiry in this case is similar to that in *Kirby*: what constitutes an "*action to enforce the provisions* of this article for the collection of due and unpaid wages

15

claimed by an individual" for purpose of Labor Code section 229. The fact that a remedy may constitute wages for purposes of *Naranjo* is simply irrelevant in determining whether the <u>action</u> is brought to enforce the provisions of Article I of the Labor Code. While not binding on this Court, the Ninth Circuit's unpublished decision *Morales v. U.S. Dist. Ct. for Cent. Dist. of Cal., L.A.*, No. 24-536, 2024 WL 3565262 (9th Cir. July 29, 2024), reflects this same distinction. *Id*. at *3 ("By clearly distinguishing between the violation (no breaks) and the remedy (extra compensation), *Naranjo* did not recharacterize a claim for meal-and-rest-break violations as an action to collect unpaid wages.") These cases illustrate that in addition to being for the collection of due and unpaid wages (as that term is understood in *Naranjo*), an action for enforcement under section 229 must have a statutory basis in Article I of the Labor Code. Only Plaintiff's causes of action one and six meet this requirement. Therefore, Defendant may validly seek to arbitrate Plaintiff's second, third, fourth, fifth, seventh, and eighth claims consistent with Labor Code section 229. As Plaintiff does not identify any other exemption that would apply to those claims, they must be arbitrated pursuant to California law.

  While the first and sixth causes of action are not subject to arbitration, the Court must also consider whether the class action waiver for these claims is valid under the California Supreme Court's decision in *Gentry*. The party seeking to invalidate a class action waiver must provide a "proper factual showing" for the Court. *Gentry*, 42 Cal. 4th at 466. *Gentry* outlines four factors to be considered by courts when weighing class action exemptions in arbitration agreements: (1) "the modest size of the potential individual recovery"; (2) "the potential for retaliation against members of the class"; (3) "the fact that absent members of the class may be ill informed about their rights"; and (4) "and other real world obstacles to the vindication of class members' right[s]." *Id.* at 463–64. If, after considering these factors, the court finds that a class waiver "will likely lead to a less comprehensive enforcement of overtime laws" and that class proceedings would be "a significantly more effective practical means of

vindicating the rights of the affected employees," the agreement's class prohibition is unenforceable. *Id*. at 463.

      First, Plaintiff's claims are modest and would lead to moderately low recovery. She is paid a relatively low salary (approximately minimum wage) and the unpaid wages she is suing for stem from a limited period of time. (*See* Opp'n at 8; *see also* Decl. of Justin Hewgill, hereinafter "Hewgill Decl." at ¶¶ 2, 3.) *Gentry* itself provides a helpful data point in weighing recovery amounts, citing with approval a case in which an *individual* claim "as large as $37,000" was found to be an insufficient incentive for individual actions under this factor. *Gentry*, 42 Cal. 4th at 458 (citing *Bell v. Farmers Ins. Exch.*, 115 Cal. App. 4th 715, 745 (2004)). Plaintiff's relatively low salary and the unpaid wages she is suing for stem from a specific and limited period of time and would likely result in a potential recovery lower than the $37,000 that *Gentry* believed was a modestly low recovery. Additionally, she is suing on behalf of a class of workers in single factory, which necessarily limits the size of the class and of the potential payout. After weighing these considerations, the Court finds the first *Gentry* factor is in Plaintiff's favor.

      However, under the second factor, Plaintiff does not establish that she or similar workers would face retaliation. In her briefing and attached declaration of her attorney, Plaintiff posits that "lower wage workers are more vulnerable to losing their jobs and will likely not bring claims against their current employer – for fear of retaliation real or perceived." (Opp'n. at 9; *see* Hewgill Decl. ¶¶ 4–6.) But Plaintiff does not illustrate whether and how this generalization applies to her or her fellow workers; she merely relies on the self-serving and general declaration of her own attorney. (*Id.*) Accordingly, the Court finds that the second *Gentry* factor does not weigh in Plaintiff's favor. Under the third factor, whether the class members would be informed of their rights, Plaintiff similarly does not provide any information as to how her potential class is informed or uninformed of their rights. She again relies solely on generalizations from her attorney. (*Id.*) This factor similarly does not favor Plaintiff.

The last factor is unavailing for Plaintiff. While there are numerous barriers to potential plaintiffs levying claims against their employers, Plaintiff again relies on the self-serving declaration of her attorney and does not provide any specific information about the barriers she or her class would otherwise face to bring suits like the present action. (*See id.*) Accordingly, this factor weighs in favor of Defendants.

After weighing the *Gentry* factors, the Court does not find that disallowance of the remaining class-based claims to proceed "will likely lead to a less comprehensive enforcement of overtime laws" and that class proceedings would be "a significantly more effective practical means of vindicating the rights of the affected employees." *Gentry*, 42 Cal. 4th at 463. Accordingly, as to the claims not subject to arbitration –the first and sixth causes of action – Plaintiff is limited to bringing these causes of action on an individual basis, and her class action claims are dismissed.

## CONCLUSION

In accordance with the above, Defendant's Motion to Compel Arbitration (ECF. No. 11) is GRANTED in part and DENIED in part. Plaintiff may proceed with her first and sixth causes of action on an individual basis, and must arbitrate her second, third, fourth, fifth, seventh, and eighth causes of action. As to the first and sixth cause of action, those claims are STAYED pending the resolution of the claims that must be arbitrated. *See Muller v. Roy Miller Freight Lines, LLC*, 34 Cal. App. 5th 1056, 1070 (2019).

IT IS SO ORDERED.

Dated: **February 27, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC5 – saul24cv01331.mtca

18